[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This memorandum of decision addresses an action in which Timothy Doyle and his former wife, Lisa Dijon, claim that property they purchased on Little Pitch Road in Litchfield is contaminated by leachate from the former landfill once operated by the town of Litchfield approximately one-quarter mile to the southeast. The plaintiffs (hereafter referred to as Doyle) have sued the former owners who sold them this property (Arthur, Timothy, and Hugh Webster, hereafter referred to as the sellers), the real estate agents who acted on the Websters' behalf (Ted Murphy and Diane Paterno, referred to hereafter as the brokers), and the town of Litchfield (hereafter, the town). For the reasons stated below, the court enters judgment for all defendants on all counts.
Part I of this opinion summarizes the legal proceedings and issues presented here, Part II contains the court's preliminary findings of fact necessary for discussing the ultimate factual questions of contamination and source, Part III discusses the court's analysis of the expert opinion testimony and the other evidence and its conclusions on the key factual issues, and Part IV states the court's resolution of the parties' claims for damages and other relief.
 I — NATURE OF PROCEEDINGS 
The gravamen of the plaintiffs' various causes of action against the town is their allegation that testing of soil, surface water, and ground water on their property[1] shows the presence of leachate containing toxic and hazardous substances emanating from the former landfill. Against the sellers and brokers the plaintiffs claim in numerous counts that these defendants knew or should have known that the presence of landfill leachate contaminants on the property made it unsuitable for the CT Page 176 Doyles' intended uses. After a bench trial held before this court on numerous days in May, June and July 2000, the parties agreed at closing argument that the court would first decide the plaintiff's factual claims that leachate flowing from the former Litchfield landfill had contaminated their property. The parties have since agreed that the court, in addressing this question, must determine whether the plaintiffs met their burden of proving that their property is contaminated (referred to in this decision as the "contamination issue") and that leachate flowing from the former landfill caused any such contamination (referred to here as the "source issue"). Resolving those questions of fact depends in large, though not exclusive, part on the opinion testimony of the parties' expert witnesses.
 II — PRELIMINARY FINDINGS OF FACT[2] A. The Doyle Property
On March 11, 1996, the plaintiff Lisa Dijon purchased the property in question, a parcel of land on 3.58 acres located at 521 South Plains Road, at the intersection of South Plains Road and Little Pitch Road in the town of Litchfield.[3] The property contained a colonial-style farmhouse built in 1802, a small pond, and gently sloping land. After a summer wedding she and co-plaintiff Timothy Doyle planned to raise a family and run a horse-breeding farm on the property. In the months immediately before and after the plaintiffs moved into the subject property in September 1996, Doyle obtained zoning and conservation permits from the town and undertook a series of improvements on the land to ready it for their horse breeding plans. This work included removing trees, clearing land, some blasting and excavating on the land, moving dirt, removing old drain pipes and installing new ones to direct water flow on the property to and from the pond, and installing a riding ring and a leased horse barn.
Even before moving in that September, however, Doyle became concerned about the condition of the water in the pond. In the early spring of 1996, he saw floating dead fish and pollywogs and an orange haze or sheen on top of the pond. After taking samples of water from the pond and having them tested, seeing orange stains at other locations on his property, talking to neighbors, engaging an environmental testing company to do additional testing, finding a groundwater spring in a shed on the property that had been locked until the closing, and learning that the leachate from the landfill had been the subject of previous litigation and orders from the state department of environmental protection, he came to believe that landfill leachate had also contaminated his own property. The present litigation ensued. CT Page 177
B. The Litchfield Landfill
Approximately one-quarter miles to the southeast of the Doyle property, the former Litchfield landfill, now a waste recycling facility for the town of Litchfield, was for fifty years the town dump for solid waste disposal. It accepted a variety of residential, commercial, and industrial waste. Located in "a steep . . . valley that is estimated to have been twenty-five feet deep and one hundred feet wide" (Pl.'s Ex. 33, "Litchfield Landfill Closing Plan," 3) between two bedrock ridges, the landfill grew over the years to occupy 7.4 acres of land rising to a height of 45 feet at its center. The water table in the center of the landfill is more than 20 feet higher than the base of the refuse. The historical use of the site and its hydro-geology resulted in leachate from the landfill entering the bedrock system underneath the dump and flowing into local groundwater and surface water systems. In 1982 the state department of environmental protection (DEP) entered a pollution abatement order against the landfill. A hydrogeological study done that same year by the engineering firm of Fuss O'Neill for the town documented the presence of leachate contamination in the fractured bedrock adjacent to the landfill and some nearby surface waters. The Fuss O'Neill hydrogeological study reported that the principal pathways for leachate migration from the landfill were to the north and south along the fracture trend in the bedrock, but that leachate also flowed toward the northwest in the general direction of the Doyle property.
In response to the DEP order, the town of Litchfield thereafter developed, adopted, and implemented a landfill closure plan, installed ground and surface water monitoring wells, began monitoring water quality at various private wells, and extended water mains to properties near the landfill potentially affected by the landfill's flow of leachate. Since leachate contamination from the landfill is carried into the bedrock by water, part of the town's closure plan involved placing a covering material composed of soil and ash derived from incinerated sludge on the top on the landfill to reduce the amount of rain and surface water entering the landfill. Because the landfill sits in a wetland area in a bedrock valley partially above the water table, however, the landfill base remains saturated despite the closing of the landfill and the ash cap covering; as a result, the landfill will continue to generate leachate through ground water entering bedrock at the base and sides of the landfill for many years. The town has continued to collect and analyze water samples obtained from the various monitoring wells quarterly to detect the presence of leachate constituents at the various locations.
 III — DISCUSSION 
CT Page 178
The plaintiffs have advanced two different factual bases for recovery. In their complaint, the opinion testimony of their expert, and their post-trial memorandum, the plaintiffs have asserted that elevated levels of toxic landfill constituents hazardous to human health have flowed as leachate to surface and ground water on the Doyle property. There appears to be no dispute among the parties that such a finding would be a basis for liability, at least as to the town. In their memorandum and closing argument, the plaintiffs also allege that even one molecule of leachate from the landfill entering the Doyle property would sustain their burden of proof. Although the defendants dispute this second "one molecule" theory, the court here, by virtue of its ultimate factual conclusions, need not resolve that legal question.
To establish the presence of landfill leachate on their property, the plaintiffs called Michael Mahan, president and senior hydro-geologist for SMC Environmental Corporation, as an expert witness. The heart of Mahan's opinion testimony that landfill leachate has reached and contaminated the Doyle property rested on two premises: his conclusions (a) that the samples from the Doyle property contained elevated levels, or exceedances,[4] of hazardous landfill constituents and (b) that leachate could, by a combination route of surface water and ground water, migrate from the landfill to the plaintiffs' property.[5] In their post-trial memorandum, the plaintiffs also advance a leachate plume theory: that "the presence of one species of landfill contaminant . . . at every point on the map around the Doyle property and the presence of another species of landfill contaminant . . . on the Doyle property" establishes that landfill leachate transported those constituents to the Doyle property. (Pls.' Post-trial Memorandum at 12.)
To refute these claims, the defendant town called Jeffrey Heidtman, a hydro-geologist and chief executive officer of Fuss O'Neill, the engineering firm that has done extensive work for the town regarding the town's former landfill, as an expert witness. Heidtman testified that Mahan's opinions about the presence of elevated levels on the Doyle property — and the methodology Mahan used to derive them — were not scientifically valid or reasonable. He also disputed Mahan's conclusion about a leachate pathway from the landfill. In deciding whether the plaintiffs met their burden of proof, the court must, as the trier of fact, therefore consider the conflicting opinion testimony of the two experts on these two factual questions.[6]
A. The plaintiffs' claim of a water pathway between the landfill andtheir property 
One premise of Mahan's opinion that landfill leachate has contaminated the plaintiffs' property was his conclusion that there was a route by CT Page 179 which landfill leachate could migrate via surface water and ground water from the former landfill to the plaintiffs' property. He testified that he based this opinion on prior geological studies conducted for the town by Fuss O'Neill and Anderson Nichols and on his own observations of surface water flow and bedrock outcroppings between the landfill and their property. He maintained that leachate from the landfill follows a surface water pathway from the landfill to an area near a culvert on Little Pitch Road approximately 600 feet southeast of the Doyle property (hereafter, culvert number two[7]), from whence the surface water enters one of two wetland areas, and that the leachate then migrates via ground water to the Doyle property. He also testified that seasonally surface water could flow all the way from the landfill to the plaintiffs' property — from culvert number two westerly to culvert number one, which Mahan testified would direct the water under Little Pitch Road and onto the plaintiffs' property. Heidtman agreed with Mahan's conclusion that surface water influenced by landfill leachate could, "[a]t times of higher flow," (Heidtman Test. of 6/1/2000 at 94) reach culvert number two.[8] He maintained that it was highly unlikely, however, that water would flow from that location to the plaintiffs' property. To support their conflicting opinions as to the flow of ground water and surface water from culvert number two, the two experts cited aspects of the earlier Fuss O'Neill geological studies, the strike and dip of the bedrock planar features in the area, and topographic and piezometric information.
Heidtman's testimony raised enough questions about the topographical features of the area to cast serious doubt on Mahan's testimony of an entirely surface water pathway from the landfill to the plaintiffs' property. It is a matter of common sense that surface water flows from higher elevation to lower. Heidtman testified credibly that for surface water to flow directly from culvert number two northwest to culvert number one, as Mahan claimed, the water would have to flow uphill in that direction toward culvert number one rather than downhill to the north. Using a topographical map with photogrammetric details and a cross-elevation chart (Def.'s Exhs. 2, 2A, 54) for illustration, Heidtman showed that surface water could not flow from culvert number two northwest all the way to culvert number one; before surface water can reach culvert number one, the topography of the region directs the water north, even if it overflows culvert number two, first over Little Pitch Road and then toward the same wetlands north of Little Pitch Road that culvert number two itself directs water toward. Nothing in Mahan's testimony or the evidence as a whole credibly refuted Heidtman's testimony on this point. The court therefore concludes that Mahan's claim of an entirely surface water pathway from the landfill to the plaintiffs' property is not, on the evidence offered at trial, credible. CT Page 180
On the question of whether ground water could flow, in seasons when Mahan would concede that surface water flow is not sufficient to carry landfill leachate all the way to the Doyle property, via wetlands and bedrock from culvert number two to the plaintiffs' property, the question is closer. Mahan testified that surface water from the landfill would, after leaving culvert number two, reach one of two wetland areas, the one directly north of Little Pitch Road or another on the Krhla property directly south of the Doyle property across Little Pitch Road. He testified that after surface water containing landfill leachate reaches either of these wetland areas, the leachate migrates in ground water above and below bedrock to the Doyle property. He testified that he believed this was a unique geological area where the surface water leaving the landfill fills in the wetlands on the Krlha property or the wetlands north of Little Pitch Road, recharges the bedrock and an overburden aquifer and ends up in the Doyle pond.
Heidtman testified, on the other hand, that he believed that all surface water from the landfill reaching culvert number two would eventually flow, by virtue of the topography of the area, into the wetlands north of that culvert, from where it would recharge the ground water and follow the topographical slope in a northerly direction toward the Bantam River, rather than westerly to the Doyle property. He testified that he believed the primary source for water on the Doyle property is the wetlands area on the Krhla property, and that this is probably fed by water from the south. He acknowledged, however, that Mahan's inability to obtain ground water at a depth of four to five feet at location SS-03, just south of the pond, means that in that location, at least, ground water is migrating toward the south. He also acknowledged that he had once prepared a map for the town that included the Doyle property in an area of potential leachate impact, and said that he had done so because in the absence of precise geological studies one could not preclude that possibility.
Ground water in the bedrock must obviously follow the same Newtonian principles of physics and gravity as surface water. Mahan explained, for example, that ground water tends to flow from areas of higher hydraulic pressure to lower. Yet, unlike the typographical features of the earth's surface, which are visible to the human eye and were presented on maps as exhibits for the court to examine and use in comparing and analyzing the experts' opinions about surface water flow, the subsurface features of bedrock and groundwater flow between the landfill and the plaintiffs' property are concealed from direct human observation. Although the court heard opinions from both experts about such geological features as the bedrock, likely flow of water into and out of wetlands, overburden aquifers, bedrock aquifers, and fractures, strike, and dip of the bedrock, none of the parties offered any independent, objective CT Page 181 information to assist the court in evaluating the credibility of the experts' views as to the direction of ground water migration. The opinion of each seemed plausible. Both also admitted that they had no actual geological studies of bedrock and ground water flow for the entire region between the landfill and the plaintiffs' property (the earlier Fuss 
O'Neill geological survey had only studied the landfill and its immediate environs). Neither expert's opinion had the ring of authority or conclusiveness on this issue.
After hearing their testimony, observing and considering their demeanor, and re-reading the transcripts of their testimony on this subject numerous times, the court concludes that the evidence as to a possible groundwater pathway from culvert number two to the Doyle property was in equipoise. Thus, the court can only conclude that the plaintiffs, in the absence of independent geological data or other objective evidence to confirm Mahan's opinion testimony or without evidence of constituents on their property whose mere presence or quantity there would establish the landfill as their source (see next section), failed to meet their burden of proof to establish the existence of a pathway for leachate to migrate from the landfill to the plaintiffs' property.
B. The plaintiffs' claim of elevated levels 
The other premise of Mahan's opinion testimony that landfill leachate has reached and contaminated the Doyle property was his conclusion that the Doyle property contains elevated levels of hazardous landfill constituents. Mahan testified that he took sediment, soil and water samples at various locations on the Doyle property:
• Pond sediment (at location SS-0 I) and pond water one foot above (at location SW-0I) near the southern edge of the pond near the plastic inlet pipe that Doyle had installed;
• Pond sediment (at location SS-02) and pond water six inches below the surface of the pond ((at SW-02) in the north-middle of the pond;
• Ground soil (at location SS-03) from near the southwest edge of the pond at a depth of approximately five feet;
• Ground soil (at location SS-04) collected around three feet deep from a location just north of Little Pitch Road and approximately 60 feet west of the first culvert under Little Pitch Road off South Plains Road CT Page 182 (culvert number one), and equidistant between culvert number one and GW-01;
• Ground soil (at location SS-05) collected to 15 feet south of culvert number one from a depth of approximately one to two feet.
In addition, he also relied on data from samples of surface water taken by Arthur Boehm of Environmental Health and Safety Services of New England from the bottom of the Doyle pond and of ground water that discharges into the pond from a plastic pipe.
Both Mahan and Boehm directed laboratories they engaged to test these various samples for the presence of various typical landfill constituents: volatile organic compounds (VOCs), total petroleum hydrocarbons (TPHs), various metals commonly associated with landfills, and other constituents. None of the defendants disputed the validity of the sampling techniques or the accuracy of any of the laboratory findings on which Mahan relied. Instead, they focused on the conclusions that Mahan derived from those findings.
Mahan testified that:
• Samples of pond sediment at SS-01 and SS-02 and the ground soil at SS-03 and SS-04 all contained elevated levels of barium, chromium, and lead; and
• Samples of pond water contained elevated levels of cyanide, nickel, copper, lead, benzene and zinc that constituted a hazard to human health (Tr. of 5/17/2000 at 36-49)[9]
Acknowledging that none of the various standards established for these constituents by the state and federal governments are directly applicable to the Doyle property (because there have been no discharges of such constituents that would invoke such standards), Mahan testified that he instead used certain of those standards that he said were related to human health hazards "for comparison purposes."[10]
 1. The sediment and soil on the Doyle property 
Although initially referring on direct examination to both the pollutant mobility criteria (PMC) and the residential direct exposure criteria (RDEC) as "two criteria that can be used . . . for comparison purposes," the balance of Mahan's testimony about elevated levels or exceedances in soil or sediment on the plaintiffs' property relied CT Page 183 exclusively on the pollutant mobility criteria.[11] Mahan identified the PMC as "a list of concentrations for each constituent, or each compound that is a relative health-based cleanup criteria . . . used for constituents in soil . . . as a mandatory cleanup standard." (Mahan Test. of 5/16/2000 at 22. ) He testified that he used the PMC by applying what he referred to as a "factor of twenty" analysis, which he explained as dividing the total mass of the constituent found in the sample by twenty and comparing the resulting number with the PMC.[12] He justified this methodology by explaining that:
 Elsie Patton at DEP in a seminar that she put on that myself and other people of my company were at, she specified that people could use the factor of twenty to determine if they exceed or are close to the pollutant mobility criteria, only for comparison purposes.
(Tr. of 05/17/2000 at 104.)
The specific results that Mahan claimed to violate the PMC were findings for the presence of barium, chromium, and lead in the pond sediment and soil samples taken from the Doyle property. It is undisputed that the total mass of each metal in each of these samples and the quotient resulting from the factor of twenty analysis exceed the number established by the PMC, as shown in Table 1 located later in the text. Through cross-examination, their own expert's testimony, and introduction of the actual DEP regulations into evidence, however, the defendants cast grave doubt on the reliability and validity of Mahan's use of the PMC or the factor of twenty analysis.
The purpose of the residential direct exposure criteria is, according to Mahan himself, "to characterize what . . . quality of soil that people could come in . . . contact with." (Tr. of 5/17/2000 at 99- 100.) They have, he acknowledged, "a human health rationale" — "to be able to determine whether the content of the soil is going to pose a risk to those who come in direct contact with the soil. . . . either by ingestion or some other means of bringing it into contact with their body. . . ." (Id., 100.) Explaining that the pollutant mobility criteria are "a measure of . . . the leachability of contaminants out of the soil" (Mahan Test. of 5/16/2000 at 23), he said that the PMC are "set up to protect ground water. So they are concerned with what's leaching out of the sample that could potentially impact ground water." (Tr. of 5/17/2000 at 97.) Heidtman concurred with this analysis.[13]
On direct examination Mahan admitted that there are more accurate ways than the factor of twenty analysis to measure the potential for CT Page 184 contaminants leaching out of soil and into ground water: "Laboratories can perform an analysis which is referred to as either the TCLP, or toxicity leachate precipitate . . . procedure, or the SPLP which is synthetic precipitate leachate procedure." (Mahan Test. of 5/16/2000 at 41.) In each such procedure, an acidic solution dilutes the mass of the substance being tested to determine whether and to what extent the constituent is capable of leaching out to ground water. (Tr. of 5/27/2000 at 97.) Heidtman explained further that the TCLP test "attempts to simulate leaching in a very aggressive environment, i.e., like inside a landfill." He described the SPLP as "a more reasonable test, one that is more aggressive than mother nature, . . . but not as aggressive as the TCLP test. . . (Heidtman Test.of 5/31/2000 at 85.)
Mahan justified using the factor of twenty methodology because "the number of twenty comes from the actual volume of the dilution that they're using for the extraction fluid" in the TCLP and SPLP test. In other words, the sample being analyzed is dissolved in a solvent that is twenty times the mass of the original sample. Although acknowledging that the factor of twenty analysis assumes that "100 percent of the mass of [the] material would leach out if it were exposed to dilution," (Tr. of 5/17/2000 at 102) he also admitted that such an assumption is not accurate. On cross-examination, he conceded that, in most instances, one hundred percent of the mass does not leach out and that it is rare for metals to leach out at 100 percent of their mass value. Heidtman concurred that "[i]t doesn't happen very much." (Heidtman Test. of 5/31/2000 at 101.)
During a particularly effective portion of cross-examination, Mahan was questioned about the results of 1999 testing by Arthur Boehm of Environmental Health and Safety Services of New England on samples from the ash cover placed on the landfill. Boehm analyzed mixtures of soils taken from various locations on the landfill for total and extractable metals using the SPLP and TCLP tests. As Mahan conceded, the total mass of barium at one location, 194 mg/kg, divided by twenty equaled 9.7, whereas the SPLP test produced only .18 mg/L; at another location, the total mass of barium was 74.6 mg/kg; the quotient of that number divided by twenty was 3.73, but the extract yielded by the TCLP test was only .46 mg/L. In Boehm's various barium findings at the landfill, the total mass found exceeded the leachate extract derived by the SPLP or TCLP methods by from 160 to 1300 percent.
Analysis of 1997 samples that Boehm took from the landfill yielded similar results: a sample of lead that was 1960 mg/kg yielded, when subjected to TCLP solution, 1.31 mg/L of leachate, a difference of almost 1,500 percent. When questioned whether "in order . . . to give an opinion that the pollutant mobility criteria is exceeded in any of these Doyle CT Page 185 property samples for 1998, wouldn't it actually be necessary to run a TCLP or SPLP test," (Tr. of 05/17/2000 at 112) Mahan acknowledged that "it would increase the accuracy of the data . . . to add more data would only help,. . . ." but claimed that it "is not necessary." (Id., 112-13.) Challenged to justify not doing an SPLP or TCLP extraction on the samples of metals he found at the Doyle property, as the pollutant mobility criteria regulations would require, Mahan could only answer that he did not believe it was necessary to do so since he had only used the PMC for comparison purposes.[14]
Despite Mahan's claim that. a factor of twenty analysis can be used to determine if soil contains elevated levels, Heidtman's explanation is much more credible: that a factor of twenty analysis is useful only for determining whether one could argue about the need for further testing; if the mass divided by twenty does not exceed the pollutant mobility criteria, then there is no possibility that such a leachate from such mass, when diluted twenty-fold in a solvent, will exceed the PMC even if one hundred percent of the mass leaches out.
Mahan never offered an adequate explanation, moreover, why the residential direct exposure criteria are not the appropriate governmental standards to consider when analyzing soils for possible harm to health through direct contact, ingestion and inhalation. Since they take into account such human health factors in assessing risk of human contact with soil as target cancer risk level, hazard index, cancer slope factor, ingestion rate, exposure frequency and duration, and body weight; §22a-133k-2(4)(B) Regulations of Connecticut State Agencies; the direct exposure criteria would seem to be the appropriate standard for determining human health risk. When asked why he did not rely on the residential direct exposure criteria, Mahan gave the same response as to why he had not used the TCLP or SPLP tests — that the residential direct exposure criteria are not directly applicable to the Doyle property. A second reason he gave for using the PMC as his criteria for comparing the soil and sediment is that he initially claimed his soil samples were taken at or below the water table "so they had come into contact with the groundwater." (Mahan Test. of 5/16/2000 at 40.) Yet Heidtman's own testimony demolished that premise; and Mahan himself eventually admitted that all of his samples were taken above the groundwater level. None of Mahan's answers or reasons is credible, in light of the rest of the evidence. It seems far more likely that the RDEC, not the PMC, would be the relevant criterion to apply to ground soil on the plaintiffs' property.
The court thus concludes that plaintiffs failed to establish by a preponderance of the evidence that the soil or sediment on the Doyle property contained quantities of any of the constituents about which CT Page 186 evidence was offered that exceeded any applicable standards. Mahan had admitted that the soils at the Doyle property don't "violate any legally applicable standards." (Tr. of 5/17/2000 at 90.) He admitted that the residential direct exposure criteria are the appropriate standard for measuring whether direct human contact with soil, whether by ingestion or other means, will cause a risk to human health. (Id., 100.) He admitted that the findings for barium, chromium and lead do not exceed the residential direct exposure criteria for direct contact with those substances. He admitted that the pollutant mobility criteria promulgated by the DEP require comparison of leachate extractions rather than total masses of the samples. He admitted that the factor of twenty analysis relies on an assumption of 100 percent leachate that is not always accurate. Finally, he admitted that neither the PMC nor the RDEC applied to sediment, but only to soil. There is no reliable or credible evidence that the quantities of barium, chromium or lead found on the Doyle property exceed background levels, the amounts of these substances naturally appearing in soils of the region. The court thus concludes, after considering the testimony, documentary evidence, and exhibits and considering the relevant regulations and the briefs of the parties, that the plaintiffs did not sustain their burden of proof of establishing that there were elevated levels of contaminated substances in the soil of the Doyle property in comparison with applicable and appropriate standards.
2. Pond and ground water on the Doyle property 
The plaintiffs' also claim that the pond and ground water on the Doyle property are contaminated by landfill constituents. Their expert Michael Mahan testified that elevated levels of constituents in the Doyle pond were a health hazard. In particular, he claimed that the levels in the pond water of copper, lead, zinc, cyanide and the volatile organic compound benzene all exceeded what he referred to as the surface water quality standards (hereafter, SWQS),[15][16] which he said he used as a measure of human health for comparison purposes. (Tr. of 5/17/2000 at 84.) As with the soil and sediment samples, he acknowledged that there are no directly applicable standards to the pond water, but maintained that the surface water quality standards were an appropriate standard "for comparison purposes." (Id.)
Acknowledging that there are several sets of water quality standards — four sets of aquatic life criteria (separate chronic and acute criteria for both freshwater and saltwater species) and two sets of human health criteria (for organisms only and for water and organisms), Mahan testified that he chose to compare the sample results found on the Doyle property to the surface water quality standards for chronic aquatic life criteria. As with Mahan's use of the PMC and the factor of 20 analysis, the defendants again challenged his selection criteria through vigorous CT Page 187 cross-examination and opinion testimony from their own expert.
Mahan testified that there were no directly applicable standards for measuring the levels of any contaminants in the water on the Doyle property. "[W]hen you get involved with surface water, you can only look at these [RSRs, or remediation standards] for comparison purposes." Id.
 Q So in the absence of the directly applicable standard for the surface water on the Doyle property, you cite, as you say for comparison purposes, to the surface water quality standards. Do I understand that correctly?
A That's correct.
Id., 86. Mahan testified that the surface water quality standards are used to compare contaminants in actual surface water samples to determine the quality of that water for human contact. Mahan explained that he selected the chronic aquatic life criteria, as opposed to the acute criteria, because the chronic standards indicate levels at which longer-term sustained exposure to a constituent will impair the ability of aquatic species to reproduce or survive. The acute aquatic standards, on the other hand, only measure the survivability of organisms to a short-term exposure.[17] Mahan maintained that chronic aquatic criteria were an appropriate reference when determining questions of human health hazards because of the possibility that humans might drink the pond water: "I can't . . . tell you that no one is going to drink the pond water, drink the pond water only once or live off the pond water" Id., 87-88.
That explanation, however, seems dubious — Mahan never adequately explained why criteria to protect the biological integrity of aquatic species would have any relevance at all to human health or safety, particularly when the SWQS themselves contain two other sets of standards specifically designated as human health criteria. Nor did he explain why chronic criteria, for which the SWQS require three-year average statistics involving the frequency by which four-day average concentrations are exceeded, (Def.'s Ex. 73 n. 3) could be applicable or meaningfully compared to individual samples taken from the Doyle Pond. Heidtman's testimony that the chronic aquatic criteria are not applicable to individual samples taken on the Doyle property also seems more credible than Mahan's contrary claims, since the chronic criteria are, by definition, applicable to average concentrations over a period of time.
The DEP water quality standards contain two numerical columns under the Human Health Criteria, one labeled "Organisms" and the other "Water and CT Page 188 Organisms." Heidtman explained that the "Organisms" column provides the criteria for human consumption of an organism containing a particular constituent, while the "Water and Organisms" column relates to drinking water containing particular microorganisms. Even were the water quality standards applicable here, which Heidtman disputed, the SWQS standards in these two columns labeled "human health criteria" would seem more likely to apply to human contact than criteria established for aquatic species. (Heidtman Test. of 6/1/2000 at 52.)
Heidtman testified, on the other hand, that the surface water quality standards do not have any application to the water samples taken from the Doyle property and that using the water quality standards for the Doyle pond samples is not valid. He testified that the purpose of the SWQS is "to manage treated discharges to fresh water and salt water systems. . . ." (Heidtman Test. of 6/1/2000 at 38.) The water pollution control regulations adopted by DEP for the granting of treated water discharge permits refer repeatedly to the water quality standards as a guide to planning and designing treatment facilities or to reducing discharges under the National Pollution Discharge Elimination Program. See Regs., Conn. State Agencies § 22a-430; Def.'s Ex. 74. As Heidtman testified, the DEP ground water remediation standards use the chronic aquatic species water quality standards as cleanup criteria for remediating certain of those discharges.[18] The DEP has adopted surface water protection criteria (SWPC) as standards for remediating a groundwater plume[19] polluted by a release.[20] The purpose of these SWPC, as Mahan admitted, is to protect surface water from contaminated ground water by setting cleanup standards for ground water where there has been a discharge of a toxic substance.[21] The SWPC also use the water quality standards for aquatic life as the numerical criteria for remediating certain of those discharges.[22]
As to Mahan's claim that he used the chronic aquatic criteria because of the possibility that people would drink the pond water, or possibly even live on it, he also admitted that the surface water quality standards are not used to determine the quality of surface water for drinking, but only for human contact. (Tr. 5/17/2000 at 79.) Heidtman testified that the state department of health services has adopted other "regulations that govern the use of a surface water supply for treatment for drinking, and it requires monitoring, it requires treatment, it requires certification." Those regulations may be found in the "Standards for quality of public drinking water" set forth in section 19-13-B102 of the Regulations of Connecticut State Agencies.
Moreover, the surface water protection criteria that designate the chronic aquatic criteria as cleanup goals are only one of two sets of ground water mediation standards adopted by the DEP. The DEP has also CT Page 189 adopted ground water protection criteria (hereafter, GWPC), which are, for the most part, more stringent standards than the SWPC. Heidtman testified that the SWPC are more concerned with "flora and fauna" whereas the GWPC focus more on human health concerns, and that the GWPC are closely related to the drinking water standards, also known as maximum contaminant levels or MCLs. (Heidtman Test. of 6/1/2000 at 27-28.) He also stated that humans have a much greater tolerance than aquatic species to metals. Heidtman's explanation of the differences between the SWPC and the GWPC is credible in light of the fact that SWPC use the aquatic SWQS as their cleanup criteria, whereas the DEP requires that cleanups from discharges in areas, such as the Doyle property, with a GA groundwater classification (which means that DEP has designated that the ground water must be fit for human consumption) use the more stringent GWPC as criteria for remediating the ground water.
Other flaws, or unanswered problems, in Mahan's testimony that the chronic aquatic SWQS are the applicable standard for comparing surface water on the Doyle property include the following:
• Heidtman testified that either the SWPC or the GWPC could conceivably be applicable to the water tested by Boehm at the end of the plastic pipe that contains ground water discharging into the pond. Either set of standards exceeds the levels of constituents found by Boehm, however.
• The chronic aquatic water quality standards used by Mahan make no reference to either the Department of Health's drinking water standards or the maximum contaminant levels promulgated by the United States Department of Environmental Protection for contact with the constituents that Mahan claimed to be elevated on the Doyle property.
Mahan testified that the levels of lead, zinc and. copper in the pond water and of barium, chromium and lead in the pond sediment and ground soil all constituted hazards to human health. He admitted that he was not an expert in toxicology and was relying on published standards for his opinion. Yet the plaintiffs did not sustain their burden of proving, by a preponderance of the evidence, that the standards on which he relied were the appropriate ones.
Early in Mahan's testimony, he stated that there are various criteria that "you can choose to compare" the findings for constituents on the plaintiffs' property. (Mahan Test. of 5/16/2000 at 21.) He similarly CT Page 190 explained, in the context of surface water samples that "[t]here are different levels you can compare these to. You can decide to compare it to a number of different . . . regulatory standards. I think you need to decide which applies to this site and which don't. . . ." (Tr. of 5/17/2000 at 24.) He also acknowledged that none of these standards were "more appropriate for use on this property" than another. (Mahan Test. of 5/16/2000 at 21.) Mahan maintained that he selected the pollutant mobility criteria for soils and sediment and the chronic aquatic water quality standards for surface water because the capacity of the soil and water for contact and ingestion made it appropriate to select the most stringent standard available.
Very little in the evidence, outside Mahan's own testimony, however, supports his selection of these criteria. Instead, the court finds his testimony that these are appropriate and valid standards for comparison not to be credible, for the reasons stated above. As the text of the various regulations and the stated purposes of the various standards confirm, Heidtman's testimony that the PMC and chronic aquatic SWQS standards are not scientifically valid for comparing the samples from the Doyle property is much more plausible. It would appear that Mahan's principal selection criterion was to choose for comparison whichever standard was most stringent, rather than most relevant to human health factors, as the following charts show. Both tables list data in milligrams per kilogram, or parts per million.
Table one, drawn from testimony and exhibits introduced into evidence at trial, depicts the pollutant mobility criteria and residential direct exposure criteria for barium, chromium and lead, the totals (T) of each metal found at the identified locations, and the numerical result of Mahan's factor of twenty analysis ("/20"):
[EDITORS' NOTE: TABLE IS ELECTRONICALLY NON-TRANSFERRABLE.]
Table Two below, also drawn from testimony and exhibits at trial, as well as relevant state and federal regulations, compares the levels of various constituents found in pond or surface water that Mahan claimed to be a health hazard with the various standards:
[EDITORS' NOTE: THE TABLE IS ELECTRONICALLY NON-TRANSFERRABLE.]
Thus, from all the evidence, the court concludes that Mahan' s reliance on the chronic aquatic life criteria is misplaced, just as is his reliance on the pollutant mobility criteria, or at least that the plaintiffs did not prove that such reliance is well-founded and credible. It instead is far more likely that the human health numerical criteria for water quality standards, the ground water protection criteria, the CT Page 191 drinking water standards, the maximum contaminant levels, and the residential direct exposure criteria would all be more relevant standards to apply to constituents found in the soil, sediment, and water on the Doyle property. To the extent there is evidence as to the numerical criteria for each of these standards in the record, the samples found on the Doyle property are all under the critical threshold levels.
For all these reasons, the court concludes that the plaintiffs did not bear their burden of establishing, by a preponderance of proof, that the surface or ground water on the Doyle property contained elevated levels of constituents exceeding recognized and applicable standards. Since the evidence as to whether leachate could be transported to the plaintiffs' property via ground water after leaving culvert number two was equivocal, the presence of constituents whose presence could only have been explained by landfill contamination might have been sufficient to establish the credibility of Mahan's conclusions about such a groundwater pathway. Mahan's conclusion that landfill leachate contaminated the plaintiffs' property, however, rested in part on his opinion that the soil and water on their property contained elevated levels of landfill constituents. The failure to sustain the exceedance premise of his groundwater route conclusion renders that conclusion improbable and not credible.
3. Background or naturally occurring levels 
Another reason for doubting that the levels of constituents on the plaintiffs' property originated at the landfill, in addition to the lack of evidence establishing a water pathway and the levels found on the Doyle property not exceeding any applicable standards, is that the levels themselves appear, from the testimony offered, to be in the range of what would occur naturally in the area. None of the constituents Mahan found on the plaintiffs' property are man-made, and he agreed that all occur naturally. Mahan initially testified that the background levels of the constituents he found do not usually exceed the pollutant mobility criteria and thus rejected that possibility as an explanation for their presence on the plaintiffs' property. (Mahan Test. of 5/16/2000 at 40.)
Heidtman, on the other hand, convincingly testified as to why the levels found probably are in the background range. He based his conclusion on two factors. First, he testified that the levels found in the soil samples at the Doyle property at SS-04 and SS-05 had not been in contact with the ground water, for, as Mahan eventually admitted, the water table was below the soil depth at which each of these samples was taken. Thus, the constituents could not have migrated to those locations via ground water. Secondly, Heidtman concluded that there was no surface water pathway from the landfill that could have been their source, a CT Page 192 conclusion the court has already found credible. (Heidtman Test. of 6/1/2000 at 65-67.) Furthermore, Heidtman testified that even if Mahan's conclusion of a surface water pathway from culvert number two to culvert number one were correct, surface water leaving culvert number one would never reach the location of SS-04 because such water would first reach a deep hole "four to five feet deep and would then overflow and flow down to the pond." Id., 65. Heidtman therefore concluded that the levels of metals found at SS-04 and SS-05, which were among the highest levels of any found on the Doyle property, indicated the naturally occurring background levels in the area.
Both Mahan and Heidtman agreed that the levels of barium, chromium and lead found on the Doyle property were within the naturally occurring range of those metals in the eastern United States. (Mahan Test. of 5/23/2000 at 64; Heidtman Test. of 5/31/2000 at 59.) Mahan even admitted that he could not "say that the levels of the three metals that [he] found on the Doyle property are elevated with respect to background. . . ." (Mahan Test. of 5/23/2000 at 64.) Heidtman explained that it is common to find variations in the background levels of a constituent found in various locations because of the "tumultuous history of the rock and soil" in the region. (Heidtman Test. of 5/31/2000 at 58.).[23]
In the absence of accepted and verified scientific data as to background levels at the Doyle property, Heidtman's conclusions seem plausible. The plaintiffs' failure to preclude the possibility that the results found on the Doyle property were naturally occurring levels is another fatal flaw in their claim to have proven that the constituents found on their property resulted from landfill leachate contamination.
C. The plaintiffs' claim of a leachate plume 
At trial the plaintiffs produced evidence of leachate contamination at neighboring properties north, west and south of the plaintiffs' property:
• South: Benzene and chlorobenzene, volatile organic compounds that are constituents of gasoline, were found once in a drinking well in 1990 at the Krlha property located directly across Little Pond Road and immediately south of the Doyle property.
• West: The Bridgeport Hydraulic Company, the local supplier of public drinking water, has claimed that in 1989 it found benzene and related VOCs in the "Webster Well Field" directly west of the CT Page 193 plaintiffs' property across Route 63.
• North: MTBE, another VOC gasoline component, was recently found in wells on Camp Dutton Road.
• East: The parties referred several times to litigation during the 1980s concerning the presence of landfill leachate on the Dingwell property east of the plaintiffs' property. The evidence also revealed that monitoring well 3-D, located southeast of the Doyle property, has detecting findings of lead and gasoline constituents.
The plaintiffs argue that the above data establishes proof that an area of leachate plume includes and spreads beyond the plaintiffs's property: "the presence of one species of landfill contaminant . . . at every point on the map around the Doyle property and the presence of another species of landfill contaminant. . . on the Doyle property compels only one logical result: The metals on the Doyle property were transported there by landfill leachate." (Pl's Post-trial Mem. at 12.)
There are two serious problems with this argument. First, they never offered any expert testimony to support this claim. Mahan conceded that, since he had done no study on the question, he could not give an opinion as to the location of any leachate plume: "I don't feel that the extent of the plume is accurately defined." (Tr. of 5/17/2000 at 151.) He even testified that determining the extent of the plume would require a hydrogeological study. Id., 151-52. Other expert testimony, however — about topographical features, piezometric lines, wetlands recharging and discharging ground water, bedrock fractures, strike and dip of the planar geological features — all make amply clear to the court that one cannot surmise a finding of landfill contamination at one location from contamination at another location. While the flow of surface water from high to low can be documented visually, testified about by either expert or lay person, and is a matter within the common understanding of most people, how particular geological features have affected the flow of ground water hidden from the human eye in a specific area is not something this court can conclude in the absence of credible expert testimony.[24]
Second, the premises of the plaintiffs' leachate plume theory are themselves questionable. The claims of the Bridgeport Hydraulic Company were never established at trial to be valid or reliable proof of landfill contamination, rather than merely a claim made; Heidtman's explanation that the presence of benzene and VOCs in the Webster oil field suggested CT Page 194 a recent, localized gasoline spill as the source was credible, particularly without persuasive expert opinion to the contrary. The lack of MTBE in samples taken at the landfill and its monitoring wells, at least without contrary persuasive expert opinion, supports Heidtman's conclusion that the MTBE found on Camp Dutton did not originate at the landfill and had an on-site origin. The inability to replicate the single finding of benzene at the Krlha property and Heidtman's testimony that poor driveway design probably allowed surface run-off of a local gasoline overflow would explain that finding. All of these explanations offered by Heidtman were credible and seemed plausible. Without persuasive evidence from the plaintiffs' to establish that these findings mean what their brief claims, the court concludes that the plaintiffs did not establish, by a preponderance of evidence, the validity of their leachate plume theory.
D. The mere iota theory 
The plaintiffs' last claim offering a possibility of relief is that if even a single molecule of landfill leachate reached their property, the defendants, or at least the town, would be liable. Although Heidtman admitted that he could not preclude the possibility of a single molecule of landfill leachate migrating to the Doyle property, there is no persuasive evidence of such migration. Mahan's conclusion that landfill constituents had migrated to the plaintiffs' property was premised on the presence of elevated levels of those constituents, a factual burden the plaintiffs' did not sustain. The evidence presented to the court did not establish, by a fair preponderance, that either one molecule or elevated levels of landfill constituents were on the plaintiffs property.
 IV — CONCLUSION 
Determining whether the plaintiffs proved that leachate migrating from the landfill has contaminated their property depended, in the final analysis, on the court's evaluation of the different experts' opinions. It is axiomatic that "`[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' Kimberly-Clark Corp. v. Dubno, 204 Conn. 137,153, 527 A.2d 679 (1987)." Jacques All Trades Corporation v. Brown,42 Conn. App. 124, 129, 679 A.2d 27 (1996), aff'd, 240 Conn. 654,692 A.2d 809 (1997); see also In re Hector L., 53 Conn. App. 359, 366,730 A.2d 106 (1999). It is within the court's province, in such situations, to determine which expert testimony, if any, is more credible than other expert opinion evidence provided for review. Keans v.Bocciarelli, 35 Conn. App. 239, 241-42, 645 A.2d 1029, cert. denied,231 Conn. 934, 650 A.2d 172 (1994). CT Page 195
The plaintiffs' expert Michael Mahan testified that elevated levels of constituents typical of landfill leachate and a surface water and groundwater pathway from the landfill to the Doyle property warranted a conclusion that the landfill had contaminated their property. The defendants' expert Jeffrey Heidtman testified that the levels of constituents found in sampling on the plaintiffs' property did not exceed applicable governmental standards of contamination, were consistent with naturally occurring background levels, and probably did not migrate to the subject property from the landfill. Having considered and weighed all the testimony, exhibits, briefs, and arguments of counsel, the court has concluded that Heidtman' s testimony was more credible than that of Mahan on most points of factual dispute. His explanation of which contamination and remediation standards were applicable to the constituents found on the Doyle property was more consistent with the text of those standards and the purpose of each standard as explained by the experts. His explanation of the surface water pathways in the area was more consistent with the topographical information introduced into evidence. His opinion as to the background levels in the area for the constituents found on the Doyle property was convincing. Moreover, Mahan admitted that he did not exclude all other possibilities for the sources of the constituents at the Doyle property. For these and all the other reasons stated above, the court therefore finds that the plaintiffs did not sustain their burden of proof to establish either contamination (that their property was contaminated by constituents) or source (that the former Litchfield landfill was the source of any such contamination). Accordingly, the court enters judgment for all defendants on all counts. SO ORDERED.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT